Filed 3/3/16  In re Mia G. CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re MIA G., a Person Coming Under the Juvenile Court Law. | B265784 (Los Angeles County Super. Ct. No. CK73593) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. R.G., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Debra Losnick, Juvenile Court Referee.  Affirmed.

Daniel G. Rooney, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, Interim County Counsel, Dawyn R. Harrison, Assistant County Counsel, Navid Nakhjavani, Deputy County Counsel for Plaintiff and Respondent.

Richard G. (Father), the father of Mia G., appeals the juvenile court's jurisdictional findings and dispositional order regarding his daughter. The juvenile court found that Father, who had a history of domestic violence with Mother, engaged in aggressive and threatening conduct and exposed Mia to extreme verbal confrontations that endangered her physical health and placed her at risk of physical harm. The court also found that jurisdiction over Mia was proper based on Mother's alcohol abuse and mental health issues. On appeal, Father contends the court's jurisdictional finding against him was based solely on alleged emotional abuse and he argues this is an insufficient basis for jurisdiction under Welfare & Institutions Code section 300, subdivision (b).[1] For that same reason, he contends the juvenile court erred in ordering Mia removed from his custody. We hold the court did not err in exercising jurisdiction over Mia, and we also uphold the dispositional order.

## I. BACKGROUND

Father and Mother are the parents of Mia G., born in 2006. Mia and her half-sister, Micaela,[2] were the subject of dependency proceedings beginning in 2008 that eventually resulted in a court order terminating jurisdiction and granting Mother and Father shared legal and physical custody of Mia. Later in 2014, the Department of Children and Family Services (DCFS or the Department) again instituted dependency proceedings involving Mia and her parents. We briefly describe the prior dependency proceedings and we then summarize the relevant facts and procedural history pertaining to the petition filed in 2014 that is the subject of this appeal.

Mother and Father have a history of domestic violence. In June 2008, law enforcement responded to the home where Mother and Father were living and Father

---

[1]     Undesignated statutory references that follow are to the Welfare and Institutions Code.

[2]     Micaela is not a party to this appeal. Mother did not appeal from the court's jurisdictional findings or its dispositional order.

engaged in a physical confrontation with the officers; he was charged with resisting arrest. Later that same month, in the presence of Mia and her sister, Father put a pillow over Mother's face, tried to suffocate her, and threw her against a door. Callers who contacted DCFS also reported that Father emotionally abused Mia and her sister, and that on one occasion he was yelling profanities at Mother while the children were present.

After learning of these and other incidents, DCFS filed a dependency petition on July 10, 2008, and obtained a court order that initially detained Mia and Micaela from their parents. The petition, which the juvenile court sustained, alleged that Mother had a 23-year history of substance abuse that endangered the children. It also alleged that Mia's parents "have a three year history of domestic violence, requiring law enforcement intervention." Describing this history in greater detail, the petition stated: "On numerous prior occasions, [Father] repeatedly struck [Mother] with [Father's] fists in the children's presence. On prior occasions, [Mother] scratched [Father] and tore the father's clothing."

The juvenile court terminated dependency jurisdiction in February 2010 pursuant to a signed mediation agreement. Pursuant to that agreement, Mia resided with her Mother (her maternal grandmother also lived in the home), and she visited with her Father every weekend and every other Friday.

The family continued to experience problems, however, and in March 2013, DCFS substantiated an allegation that Mother was generally neglecting Mia and her sister. DCFS filed a dependency petition in April, and the juvenile court dismissed the petition without prejudice in favor of informal DCFS supervision of the children and voluntary family maintenance services.

Conflicts between the parents continued. On August 26, 2014, the Monrovia Police Department responded to Mia's school because Mother and Father were arguing over the child's lice condition. Mother smelled of alcohol during the incident. Subsequent investigation by DCFS revealed Father had a reputation at the school for being verbally aggressive and a bully. A Monrovia police officer told DCFS that Mother and Father have frequent conflicts at the school and that his fellow officers had responded

to the school many times. Father blamed Mother for the arguments and complained that Mother and her family were abusive, but police found Father's statements were "evasive and inconsistent."

In October 2014, Mother was involuntarily hospitalized in connection with her mental health issues and was released several days later. Mother had been diagnosed with bipolar disorder, attention deficit disorder, and obsessive compulsive disorder. When Mother was released from the hospital, DCFS obtained a removal order for the children. Mia was detained and placed in foster care with Father's adoptive sister Linda (Aunt Linda), and Micaela was placed in a foster home.

About a month later, DCFS filed the petition in this case, alleging under section 300, subdivision (b) that Mother and Father have a history of engaging in violent altercations in the children's presence, that Father engaged in aggressive and threatening conduct toward Mother and her family, and that Mia and her sister had been exposed to "extreme verbal confrontations," such that they were at risk of physical harm.[3] In a separate count, the petition also alleged that Mother's alcohol abuse and psychological problems rendered her incapable of providing regular care for Mia.

A Department report filed in advance of the detention hearing on the petition detailed Father's hostile and aggressive conduct. The report indicated, among other things, that Father was emotionally abusive towards the children and would scream and

---

[3]      The petition as filed included count a-1, alleging a violation of section 300, subdivision (a). The juvenile court, at the Department's request, struck that allegation. Counts b-1 and b-2 alleged jurisdiction over Mia was proper under section 300, subdivision (b) based on Mother's alcohol abuse and mental and emotional problems. The sole count against Father is count b-3, which reads as follows after amendments the juvenile court made by interlineation: "The children, Micaela [] and Mia[]'s [Mother] and the [M]other's male companion, [F]ather of the child Mia, have a history of engaging in violent altercations in the children's presence and the children were former dependents of the Juvenile Court due to the domestic violence. [Father] engages in aggressive and threatening conduct towards the mother and her family. The children have been exposed to extreme verbal confrontations. Such conduct by [Father] against [Mother] endangers the children's physical health and safety and places the children at risk of physical harm damage and danger."

4

yell at the top of his lungs.  Micaela stated that Father was "scary" and "abusive" and that she had witnessed him abusing Mother in the past.  The Department reported that as result of his conduct, Mia was very intimidated by Father and she exhibited negative compensating behavior, such as going "selectively mute" to avoid talking.  Mia had also been observed hiding in the closet, and on one occasion she cut up her teddy bear and buried it in the backyard.

The Department also detailed Father's outbursts and aggression toward Department social workers and others, including his own family.  The prior social worker on the case described Father as having a history of becoming verbally aggressive with DCFS staff and being "highly manipulative."  DCFS case files indicated that Father had become so "irritated and out-of-control" during an interview at Department offices during the dependency proceedings in 2008 that he was asked to leave the building.  Father's family members, including his own mother and his adoptive sister (Aunt Linda), reported similar aggressive conduct, as did maternal relatives, Monrovia police officers, and staff at Mia's elementary school.  As a result, the assigned social worker and members of Father's family believed he had an untreated and undiagnosed mental illness that rendered him unable or unwilling to understand his behavior was harmful to Mia.

The conduct reported to DCFS also included physical aggressiveness by Father.  In addition to his prior domestic violence with Mother, Father's former girlfriend and first wife told Aunt Linda that Father had assaulted them in the past, and his cousin stated that Father had hit him on the head with his fist on an unspecified prior occasion.  Aunt Linda also observed an incident in February 2014 when Father's mother's dog got out of the house and Father chased it, caught it, pressed his knee against the dog's ribcage and put his hands on the dog's face so it couldn't breathe.  Mia was present at the time.

DCFS determined that although Father had completed an anger management class in connection with the prior dependency proceedings, his current behavior established his conduct had not improved.  When Father met with the assigned social worker to discuss whether Father would meet with a mental health evaluator to assess his needs, Father

5

declined and denied he had any problems.  The Department's detention report concluded that Mia and her sister were unsafe in the custody of their parents and that the case presented a high risk of abuse.

The court ordered Mia detained on November 5, 2014.  The court ordered domestic violence counseling for both parents and drug rehabilitation and testing for Mother.  The matter was set for adjudication.

DCFS prepared a report in advance of the jurisdiction and disposition hearing that provided additional information about Father's behavior, including the effects it had on Mia.  When asked about the allegations against Father in count b-3 of the petition, Aunt Linda told the assigned social worker that her brother (Father) "has always been this way," and that the family had encouraged him to get a mental health evaluation because there is something mentally wrong with him.  Aunt Linda opined that Father was "extremely mentally abusive" toward Mia, and revealed she had suffered a bout of diarrhea after he yelled at her during a phone call in November 2014.[4]  Mia's sister Micaela told the Department that when she lived with Father in the past, he would hit her and Mother, and he would always yell and scream.  Micaela said she had asked Mia about how Father treats her and if she is afraid of him, but Mia just responded "I can't talk about that."  When the social worker interviewed Mia, she was shy, withdrawn, and hesitant to completely engage, but she did say the following:  "He has a temper and yells. He only has a bad temper on the phone.  When he calls me on the phone he yells and has a temper.  I want to stay with my aunt Linda but I miss him."

DCFS also interviewed Father when preparing the jurisdiction and disposition report.  As recounted by DCFS, Father asserted that he had not been the offending parent in the prior DCFS proceedings; he claimed that he caught the previously assigned social

---

**4**      A Department report also mentions an incident when Mia suffered an upset stomach after a phone call from Father during which he yelled at her and said Aunt Linda was "of the devil."  It is not clear from the report, however, whether this is the same November 2014 phone call or a second, separate episode.

worker in a lie and reported her to internal affairs, and she in turn had "made up all this stuff about me." He also stated the current allegations against him were also false, asserting that Mother and Mia's maternal grandmother were "bringing up all these lies about me," and Aunt Linda was plotting against him. Father also told DCFS that Mother, Mia's maternal grandmother, and Mia's sister Micaela were the ones who yell and scream and use the "f word" all day long; he contended that they "are all lying about me because they know I will be telling DCFS the truth about them." In addition to summarizing Father's statements, the jurisdiction report also referenced two statements obtained from Father's church friends that expressed surprise at the accusations made against him and testified to their positive observations of the interaction between Mia and Father.

The Department also prepared a multi-disciplinary assessment team (MAT) report concerning Mia. (The Department conducts a MAT review to ensure that a child's needs are assessed and appropriate services are provided.) During the MAT review, Mia revealed she felt scared when Father yells and wanted him learn how to control his anger. She also stated she wanted to remain living with Aunt Linda. In addition to recounting Mia's statements and recommending appropriate services, the MAT assessor who prepared the report described her own interaction with Father when attempting to schedule a meeting during the review process: "Soon after the phone conversation began the father became audibly angry. He ranted about how Mia was being abused, that DCFS had conspired against him, that there is 'serious stuff' that this Assessor doesn't know about. This Assessor tried to stress that the MAT Assessment was not an investigative report but one to determine strengths and needs of the children and family. . . . Due to the father's level of anger, his repeating the same information and the unproductive status the conversation had taken, this Assessor told the father that meeting before his monitored visit with Mia (1/6/15) would not be beneficial and would not take place tomorrow . . . . This Assessor had to let the father know she would be ending the phone call due to his inability to calm down and inability to focus on other than [*sic*] his reports about the abuse of other family members against Mia. The call was ended by this Assessor . . . .

7

[¶]  Because of the concern over the father's tendency to become easily angered, this Assessor felt it best not to meet face-to-face with the father."

The court continued the jurisdiction hearing twice and eventually set it for April 22, 2015.  Prior to the hearing, a supplemental report from DCFS indicated that Father was enrolled in domestic violence classes but had attended only one or two; the report also stated Father had not taken an anger management course nor had he participated in individual and joint counseling.  Attached to the supplemental report was a handwritten note from Mia addressed to DCFS in which she wrote, among other things, that she did not want to go back with Mother or Father because she did not feel safe with them— adding "please help."  A last minute information report for the juvenile court stated Father had three monitored visits with Mia that had "gone well" according to a Department social worker.[5]  The report also indicated, however, that Mia told DCFS that she did not want to live with Father, preferring to stay with Aunt Linda instead.

The parties appeared for the jurisdictional hearing on April 22 as scheduled.  At that hearing, Father argued that jurisdiction was not proper under section 300, subdivision (b) because his aggressive and threatening conduct did not put Mia at risk of serious physical harm or illness as required by that subdivision.  Other than the event where the parents argued over Mia's head lice in August 2014, Father argued that there was no information that would describe domestic violence between Mia's parents; Father also argued there had not been any illnesses that Mia suffered as a result of the parents' conflict.

Mia's lawyer stated she did not believe the issues were "just between the parents." Instead, she emphasized that the social workers, Father's relatives, the school staff, and Micaela and Mia all reported years of Father's aggressive and threatening conduct.  That

---

**5**     Father's visits with Mia were monitored by DCFS personnel because Father's mother (Mia's paternal grandmother) refused to monitor the visits because of Father's "aggressive and explosive behavior."  Mia told social workers that her parents "act fake and different at the monitored visits."

conduct had affected Mia to the extent that she became physically ill, hid in closets, and went selectively mute—and yet Father denied that his behavior was inappropriate. Mia's attorney also emphasized that "Mia is affected by her father's inability to control himself and his inability to engage in appropriate behaviors and interactions in her presence. She is scared. She has physical manifestations of her fear, and she needs counseling which she is receiving to deal with the tumultuous living environment that she was raised in." DCFS concurred with Mia's lawyer and argued that Father was verbally assaultive on an ongoing basis and that put the child at risk, particularly in the context of the parents' history of domestic violence.

The juvenile court stated it agreed wholeheartedly with the assessment and argument from Mia's attorney, and based upon DCFS's reports, the court found count b-3 of the petition true by a preponderance of the evidence. The court further found true the allegations in the petition asserting the court should take jurisdiction over Mia because of Mother's alcohol abuse and psychological problems. The court declared Mia a dependent of the court under section 300, subdivision (b).

The court further found by clear and convincing evidence that it was appropriate to remove Mia from the care, custody and control of Mother and Father. As part of Father's case plan, DCFS asked for a psychiatric evaluation of Father. The court found a psychiatric evaluation of Father would be helpful and thus ordered one. Father was granted monitored visitation, and he was also ordered to attend individual counseling to address anger management and appropriate parenting.

## II. DISCUSSION

Section 300, subdivision (b) states that a child comes within the jurisdiction of the juvenile court, and may be adjudged to be a dependent child, if the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child . . . ." Subdivision (b) provides a basis for jurisdiction that is distinct

9

from the basis set forth in subdivision (c) of the same section, which allows a juvenile court to assert jurisdiction if a child is "suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others, as a result of the conduct of the parent or guardian . . . ." The Department opted to base the count of the petition involving allegations against Father (count b-3) on the risk of physical harm or illness provisions in subdivision (b), not the emotional harm provisions of subdivision (c). Father argues this was error and urges us to reverse because the evidence demonstrates, at most, Mia was at risk of emotional abuse rather than serious physical harm or illness. We conclude, however, that the juvenile court correctly asserted jurisdiction over Mia not only because there is substantial evidence supporting the findings against Father, but also because the uncontested findings against Mother provide an adequate, independent basis for jurisdiction. We further hold substantial evidence supports the court's dispositional order removing Mia from her parents' custody.

### A. Jurisdictional Findings

#### 1. The uncontested counts against Mother establish juvenile court jurisdiction over Mia is proper

Where, as here, a dependency petition alleges multiple grounds for its assertion that a minor comes within the juvenile court's jurisdiction, we may affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. (*Randi R. v. Superior Court* (1998) 64 Cal.App.4th 67, 72.) In addition to the findings against Father, the juvenile court found true the petition's allegations that Mia was at risk of serious physical harm because of Mother's alcohol abuse and her mental and emotional problems that periodically rendered her incapable of caring for Mia and exposed her to risk of physical harm. Mother has not appealed from the court's jurisdictional findings, nor does Father contest the validity of those findings in his appeal; for good reason, as the

10

findings against Mother as alleged in counts b-1 and b-2 are amply supported by the evidence. Thus, under the circumstances presented in this case, we can and do affirm the juvenile court's decision to assume jurisdiction over Mia regardless of the views we shall momentarily express concerning the evidence that supports the juvenile court's findings on count b-3 of the petition concerning Father's conduct. (*In re I.J.* (2013) 56 Cal.4th 766, 773 [citing *In re Alexis E.* (2009) 171 Cal.App.4th 428]; *In re Briana V.* (2015) 236 Cal.App.4th 297, 308 ["'[A] jurisdictional finding good against one parent is good against both. More accurately, the minor is a dependent if the actions of either parent bring [the minor] within one of the statutory definitions of a dependent. [Citations.]'"]; *In re I.A.* (2011) 201 Cal.App.4th 1484, 1492.)

2.     *There is enough evidence, in any event, to support the jurisdictional findings based on Father's conduct*

Although we "may decline to address the evidentiary support for any remaining jurisdictional findings once a single finding has been found to be supported by the evidence" (*In re I.A.*, *supra*, 201 Cal.App.4th at p. 1492), we nevertheless exercise our discretion to explain why we are unconvinced by Father's contentions of error concerning the findings against him. (*In re Drake M.* (2012) 211 Cal.App.4th 754, 762 [court may exercise its discretion to reach challenge to any jurisdictional finding where the finding serves as the basis for dispositional orders that are also challenged on appeal].)

A jurisdictional finding under section 300, subdivision (b) requires (1) neglectful conduct by the parent; (2) causation; and (3) serious physical harm or illness to the minor, or a substantial risk of such harm or illness. (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 820.) The court may consider past events when determining whether the child presently needs juvenile court protection, as "[a] parent's past conduct is a good predictor of future behavior. [Citation.] 'Facts supporting allegations that a child is one described by section 300 are cumulative'" and the "court 'must consider all the circumstances affecting the child, wherever they occur.'" (*In re T.V.* (2013) 217 Cal.App.4th 126, 133.)

11

We consider Father's challenge to the juvenile court's jurisdictional findings using the substantial evidence standard of review. Under that standard, "our power begins and ends with a determination as to whether substantial evidence exists, contradicted or uncontradicted, supporting the [juvenile] court's determinations. We review the evidence in the light most favorable to the juvenile court's findings and draw all reasonable inferences in support of those findings. [Citations.] Thus, we do not consider whether there is evidence from which the [juvenile] court could have drawn a different conclusion but whether there is substantial evidence to support the conclusion that the court did draw. [Citations.]" (*In re Noe F.* (2013) 213 Cal.App.4th 358, 366; *In re Rocco M.*, *supra*, 1 Cal.App.4th at p. 820.)

Section 300, subdivision (b) requires proof of a "substantial risk of serious physical harm or illness" and does not permit assertion of jurisdiction based solely on emotional harm. (§ 300, subd. (b); *In re Noe F.*, *supra*, 213 Cal.App.4th at p. 366; *In re Daisy H.* (2011) 192 Cal.App.4th 713, 718 (*Daisy H.*).) In the words of the First District Court of Appeal, "[s]ubdivision (b) means what it says. Before courts and agencies can exert jurisdiction under section 300, subdivision (b), there must be evidence indicating that the child is exposed to a *substantial* risk of *serious physical* harm or illness" (*In re Rocco M.*, *supra*, 1 Cal.App.4th at p. 823 [italics in original]; see also *Daisy H.*, *supra*, 192 Cal.App.4th at p. 718.)

There was substantial evidence of such a risk before the juvenile court. Father concedes that "frequent yelling, screaming, and general obnoxiousness do not exemplify proper parenting techniques," but he argues "neither are they instances of 'serious physical harm' or the threat thereof." We disagree with the implication that Father's behavior was limited to yelling or screaming that amounted to no more than verbal abuse without further deleterious effects. Instead, there was evidence that Father's outbursts in Mia's presence had caused Mia to suffer physical illness on at least one occasion in November 2014, when she became upset and suffered a bout of diarrhea after an angry outburst from Father during a phone call. (*Ante*, at page 6.) The juvenile court was

12

entitled to rely on the illness that Mia in fact suffered, combined with Father's unchecked temper and frequent explosive outbursts, to conclude there was a substantial risk that Father's yelling and verbal abuse would induce additional episodes of illness that would cause, individually or cumulatively, Mia to suffer greater harmful physical effects unless the court intervened.

Beyond the evidence that Father's yelling and aggressive threatening conduct had caused and risked continuing to cause Mia to become physically ill, there was also substantial evidence that Father's history of violence towards Mother, his lack of progress in addressing his anger management issues, and his continuing abusive and out-of-control behavior properly caused the juvenile court to believe that Mia was in substantial danger of physical harm if and when Father were to again resort to violence against Mother in Mia's presence.

Contrary to Father's assertion, a number of courts have upheld jurisdictional findings where a child has not been physically harmed based upon the child's past exposure to domestic violence and evidence supporting an ongoing likelihood of continued domestic violence. (See, e.g., *In re T.V.*, *supra*, 217 Cal.App.4th at pp. 134-135; *In re R.C.* (2012) 210 Cal.App.4th 930.) The rationale is that "'[d]omestic violence in the same household where children are living . . . is a failure to protect [the children] from the substantial risk of encountering the violence and suffering serious physical harm or illness from it.' [Citation.] Children can be 'put in a position of physical danger from [spousal] violence' because, 'for example, they could wander into the room where it was occurring and be accidentally hit by a thrown object, by a fist, arm, foot or leg. . . . ' [Citation.]" (*In re E.B.* (2010) 184 Cal.App.4th 568, 576; see also *In re R.C.*, *supra*, at p. 942.)

To be sure, there are limits to that rationale, as exemplified by *Daisy H.*, *supra*, 192 Cal.App.4th 713. The mother in that case claimed the father choked and pulled the mother's hair, but the incident happened "at least two, and probably seven, years" before the dependency petition was filed. (*Id.* at p. 717.) There was no evidence the alleged

hair-pulling and choking occurred in the children's presence, the children denied ever seeing domestic abuse between their parents, and they stated they were not afraid of their father. (*Ibid.*) The *Daisy H.* court found the evidence insufficient to support a finding that the prior acts of domestic violence placed the children at a current substantial risk of physical harm, stating: "Physical violence between a child's parents may support the exercise of jurisdiction under section 300, subdivision (b) but *only if there is evidence that the violence is ongoing or likely to continue* and that it directly harmed the child physically or placed the child at risk of physical harm." (*Id.* at p. 717 [emphasis added].) The *Daisy H.* court also rejected the argument that name-calling by the father against the mother, combined with the allegations of prior domestic violence, were sufficient together to permit the exercise of jurisdiction under section 300, subdivision (b) on the basis of "emotional harm." (*Id.* at pp. 717-718.)

Here, there was a great deal of evidence that Father had repeatedly engaged in prior physical violence. In 2008, the juvenile court sustained allegations that Father repeatedly struck Mother with his fists in the presence of the children. DCFS reports also revealed Father engaged in a physical confrontation with one of the responding police officers and attempted on one occasion to suffocate Mother with a pillow. Micaela told social workers that Father was abusive and hit her as well as Mother, and at the jurisdictional hearing on the petition now before us, Micaela's attorney informed the court that Micaela "does stand by her statements" and "feels her sister is at risk due to those facts." What distinguishes this case from cases like *Daisy H.* and *In re James R., Jr.* (2009) 176 Cal.App.4th 129 is the ample evidence that entitled the juvenile court to find there was a risk such violent conduct would recur.

Father and Mother were forced to frequently interact because they shared physical custody of Mia, and during their interactions, they continued to have verbal confrontations, including during the August 26, 2014, incident when both were at Mia's school. Father's own mother and sister, along with DCFS personnel, explained Father continued to engage in aggressive and explosive behavior that he had difficulty

14

controlling. And to complicate matters, Father denied that he had a problem and failed to comply with DCFS requests that he complete additional domestic violence classes and an anger management program. Based on this evidence and that we have described in more detail *ante*, which we find substantial, the juvenile court could properly conclude there was a high risk that Father's anger and threatening conduct would again boil over into actual violence against Mother that would expose Mia to serious physical harm. (See, e.g., *In re T.V.*, *supra*, 217 Cal.App.4th 126, 134 [domestic violence affects children because they see and hear the violence and screaming].) Moreover, although Father's conduct toward Mia had not progressed beyond verbal abuse to physical abuse, the juvenile court could also rely on Micaela's statements and Mia's own expressed fear of her Father to conclude there was a continued risk that she herself could become a target of Father's violence, especially if she were placed in his care. The jurisdictional findings under section 300, subdivision (b) were therefore proper.

### B.    *Dispositional Order*

We review a juvenile court's removal order under the substantial evidence standard of review, notwithstanding the evidentiary standard used at trial. (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1216, fn. 4 [juvenile court makes its finding under section 361, subdivision (c) by clear and convincing evidence, but on appeal, we review the order for substantial evidence]; *In re E.B.*, *supra*, 184 Cal.App.4th 568, 578; see also *In re Cole Y.* (2015) 233 Cal.App.4th 1444, 1451-1452.)

Under section 361, subdivision (c)(1) children may not be removed from a parent's custody unless the juvenile court finds there is substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the parent or guardian's physical custody.

"A removal order is proper if it is based on proof of (1) parental inability to provide proper care for the minor and (2) potential detriment to the minor if he or she remains with the parent." (*In re T.W.* (2013) 214 Cal.App.4th 1154, 1163.)  If both requirements are satisfied, removal is appropriate even if the parent is not dangerous and the minor at issue has not yet been harmed.  "The focus of the statute is on averting harm to the child." (*Ibid.*)

Here, for the reasons we have already detailed, there is substantial evidence supporting the juvenile court's order removing Mia from Father's custody.  Father was in denial that he had anger management issues; Mother and Father had a history violent confrontations; Father had hit Mia's sister Micaela, and Mia stated she did not feel safe with either of her parents; and Mia plead for the Department's help in keeping her with her Aunt Linda rather than placing her with Father.  The facts before the juvenile court were sufficient to establish that Father was unable to properly care for Mia and removing her from his custody would prevent further potential detriment to her.

DISPOSTION

The jurisdictional findings and dispositional order are affirmed.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS



BAKER, J.


We Concur:



TURNER, P.J.



KRIEGLER, J.



17